**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,


                    - v. -                              10-cr-13 (DC)

ANIL KUMAR,

                    Defendant.


**SENTENCING MEMORANDUM SUBMITTED ON BEHALF OF ANIL KUMAR**



MORVILLO LLP
*Attorneys for Defendant Anil Kumar*
One World Financial Center, 27th Floor
New York, New York 10281
(212) 796-6330


MORVILLO, ABRAMOWITZ, GRAND,
 IASON, ANELLO & BOHRER, P.C.
*Attorneys for Defendant Anil Kumar*
565 Fifth Avenue
New York, New York 10017
(212) 856-9600

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

I. PRELIMINARY STATEMENT ........................................................................1

II. ANIL KUMAR'S BACKGROUND...................................................................3

    A.    Anil Kumar's Early Childhood and Educational History .........................3

    B.    Anil, Malvika and Aman.........................................................................7

    C.    Anil's Chronic Life Shortening Illness ...................................................12

    D.    Anil's Professional Life .........................................................................15

    E.    Life Purpose of Altruism and Improving the Lives of Others ...............20

        i.    Giving Back to India .........................................................20

        ii.    Giving back to California and the United States.....................24

        iii.    Post Arrest Contributions in India and the United States..............................................................................25

III. THE OFFENSE CONDUCT ........................................................................28

    A.    Mr. Kumar's Relationship with Mr. Rajaratnam...................................28

    B.    The Payment From Mr. Rajaratnam and Galleon ..................................33

    C.    Psychiatric Assessment and Context ....................................................33

IV. SENTENCING ANALYSIS ..........................................................................35

    A.    Mr. Kumar Has Provided Extraordinary Assistance to the Government....................................................................................37

        i.    United States v. Rajaratnam ...............................................38

        ii.    United States v. Gupta.........................................................39

        iii.    Application of Mr. Kumar's Cooperation ...............................40

    B.    Mr. Kumar's Guilty Plea Facilitated the Proper Administration of Justice....................................................................................44

C.    Mr. Kumar's Medical Condition Warrants a Downward Variance .......................45

D.    Mr. Kumar's Lifetime of Good Works Warrant Leniency ....................................50

E.    The Harm Incarceration Will Cause Anil's Good Works in India ........................53

F.    Post Offense Rehabilitation ................................................................................56

G.    Mr. Kumar's Extraordinary Family Circumstances Warrant a
      Downward Variance ...........................................................................................58

H.    Mr. Kumar's Family has Suffered in the Wake of His Arrest and
      Plea .....................................................................................................................60

I.    The 3553(a) Factors ...........................................................................................62

      i.     Anil Kumar's History and Circumstances of Offense ..............................63

      ii.    Specific Deterrence and Need to Protect the
             Community ...............................................................................................64

V. CONCLUSION .............................................................................................................65

## TABLE OF AUTHORITIES

### Cases

Gall v. United States, 128 S. Ct. 586 (2007)...................................................................... 37, 63
Simon v. United States, 361 F. Supp. 2d 35 (S.D.N.Y. 2005)............................................. 37
United States v. Barton, 76 F.3d 499 (2d Cir. 1996) .......................................................... 56
United States v. Baynor, 335 Fed. Appx. 163 (3d Cir. 2009)............................................. 47
United States v. Blake, 89 F. Supp. 328 (E.D.N.Y. 2000).................................................. 56
United States v. Blarek II, 7 F.Supp. 2d 192 (E.D.N.Y. 1998)........................................... 49, 50
United States v. Bobb, 1993 WL 8653, *2 (S.D.N.Y. 2003)............................................... 45
United States v. Cavera, 550 F.3d 180 (2d Cir. 2008) (en banc)........................................ 36, 37
United States v. Crosby, 397 F.3d 103 (2d Cir. 2005)........................................................ 35
United States v. Crouse, 145 F.3d 786 (6th Cir. 1998)....................................................... 51
United States v. Fearon-Hales, 224 Fed. Appx. 109 (2d Cir. 2007)................................... 59
United States v. Fernandez, 443 F.3d 19 (2d Cir. 2006) .................................................... 64, 65
United States v. Figueroa, 2011 WL 1592077, at *3 (2d Cir. 2011) .................................. 46
United States v. Gaind, 829 F. Supp. 669 (S.D.N.Y. 1993) ............................................... 65
United States v. Garcia, 926 F.2d 125(2d Cir. 1991) ........................................................ 44
United States v. Jimenz, 212 F.Supp.2d 214 (S.D.N.Y. 2002)........................................... 47, 48, 49
United States v. Johnson, 964 F.2d 124 (2d Cir. 1992) ...................................................... 58
United States v. Jones, 531 F.3d 163 (2d Cir. 2008) .......................................................... 63
United States v. Kimbrough, 128 S. Ct. 558 (2007)............................................................ 37
United States v. Mehta, No. Crim.01-10180-NG, 2004 WL 418119 at *6 (D.Mass March 3,
    2004) ................................................................................................................................ 51
United States v. Munoz-Nava, 524 F.3d 1137 (10th Cir. 2008 .......................................... 63
United States v. Patel, 164 F.3d 620, *3 (2d Cir. 1998) ..................................................... 58
United States v. Rioux, 97 F.3d 648 (2d Cir. 1996)............................................................ 47
United States v. Serafini, 233 F.3d 758 (3d Cir. 2000) ...................................................... 51, 52
United States v. Shuster, 331 F.3d 294 (2d Cir. 2003) ....................................................... 51
United States v. Speed Joyeros, S.A., 204 F.Supp. 2d 412 (E.D.N.Y. 2002)..................... 38
United States v. Stewart, 590 F.3d. 95 (2d Cir. 2008)........................................................ 36, 38, 64, 65
United States v. Wong, 40 F.3d 1347 (2d Cir. 1994) .......................................................... 56

### Statutes

18 U.S.C. § 3553(a) ........................................................................................................... 35, 37, 63, 64
18 U.S.C. §3553(a)(1).......................................................................................................... 36
18 U.S.C. §3553(a)(2).......................................................................................................... 65

### United States Sentencing Guidelines

U.S.S.G. §2B1.1................................................................................................................... 36
U.S.S.G. §2B1.4................................................................................................................... 36
U.S.S.G. §2B1.4(b)............................................................................................................... 36

U.S.S.G. §3D1.2 .......................................................................................................... 36
U.S.S.G. §3E1.1 (a) & (b).......................................................................................... 36

**Other Authorities**

Walter Pavlo, *Former Galleon Trader and Govt Informant, Adam Smith, Sentenced to Probation*,
(2012), http://www.forbes.com/sites/walterpavlo/2012/06/26/former-galleon-trader-and-govt-
informant-adam-smith-sentenced-to-probation/. ....................................................... 44

Patricia Hurtado, *David Plate Gets Three Years' Probation in Galleon Insider Trading Case*,
(2011), http://www.bloomberg.com/news/2011-11-02/plate-gets-3-years-probation-in-galleon-
insider-trading-case.html.. ......................................................................................... 44

Patricia Hurtado, *Ex-Lehman Broker Devlin Sentenced to Three Years' Probation*, (2012),
http://www.bloomberg.com/news/2012-03-23/ex-lehman-broker-devlin-sentenced-to-three-
years-probation-1-.html. ............................................................................................ 44

Bob Van Voris and Ian Thomas, *Ex-Galleon Trader Slain Who Led U.S. To Probe Mr.
Rajaratnam Gets Probation*, (2012), http://www.bloomberg.com/news/2012-01-20/david-
slaine-employee-who-led-to-rajaratnam-gets-three-years-probation.html. .............................. 44

Patricia Hurtado, *Galleon Insider Figure Gets Probation After Leniency Bid*, (2012),
http://www.bloomberg.com/news/2012-04-18/ex-goldman-employee-seeks-leniency-for-
insider-scheme.html ................................................................................................... 44



## I.   PRELIMINARY STATEMENT

Anil Kumar is a truly extraordinary man.  But for his involvement with Mr. Rajaratnam, he has led a life devoted to work, family, and improving the lives of and opportunities for countless people in India and the United States.

Within days of his arrest, he acknowledged his wrongdoing and began to rebuild his life.  This involved extensive cooperation with the United States Attorney that included testifying as a principal government witness in United States v. Rajaratnam and United States v. Gupta.  His early cooperation also led to guilty pleas and cooperation from several others.

When he was not actively engaged in cooperating with the government, Mr. Kumar worked to rebuild his shattered life.  In so doing, he has atoned for the impact his conduct has had on his family and friends, and taken on numerous, wide-reaching *pro bono* projects for educational and nonprofit organizations in the United States and India as an integral focus of his new consulting practice.  He is using his post-offense lease on life to make the communities in which he lives and works healthier, safer, and better educated.  Mr. Kumar is working to build institutions of higher learning; senior residential care facilities; and foundations and institutions to educate the poor, the disenfranchised, and the disabled.  He is also helping create better lives for young and old people on two continents, tirelessly shuttling back and forth, and is doing so

for virtually no compensation, other than the opportunity to make amends by giving back to society in the best and most impactful ways he knows how.

And finally, for his own sake and his family's, Mr. Kumar, with professional help, has sought to understand how his involvement with one person, Mr. Rajaratnam, led to his becoming embroiled in criminal conduct that was an anathema to all that he has stood for throughout his life.

As discussed below, incarcerating Mr. Kumar in this matter would be a draconian and unwarranted sentence, more so than for the vast majority of cooperating defendants, because it would both fail to take into account, and undo, so much to which Mr. Kumar has re-dedicated his life. Were Mr. Kumar to be incarcerated for even a short period, ███████████████

███████████████████████████

███████ his nascent practice would collapse, and he would be removed from virtually every *pro bono* project on which he now works, inevitably damaging the projects and thereby those who would benefit from them. ████████████████████

███████████ Indeed, it is not an exaggeration to suggest that hundreds, possibly thousands, of innocent people in addition to his family will needlessly suffer for Anil Kumar's wrongdoing if he were to go to prison.

Accordingly, we intend to demonstrate that, given all the relevant factors including his genuine repentance and exceptional cooperation, a probationary sentence is appropriate in this case.

## II.   ANIL KUMAR'S BACKGROUND

### A.   Anil Kumar's Early Childhood and Educational History

Born on ███████████████████, India, Anil Kumar is the eldest child of

Virendra and Kusum Kumar.  Anil has one sister, Mandira, five years younger.

From 1952 to 1989, Anil's father worked for Shell India (nationalized in 1974 to

become Bharat Petroleum ("BPCL")).  Because of Virendra's job, he and the family were

transferred around India several times during Anil's formative years.  The Kumar family moved

from Madras to Bombay when Anil was five years old and four years later were transferred to

Goa.

In 1968, the school in Goa, an underdeveloped former Portuguese colony, served

only five children in Anil's class and was not equipped to properly educate him.  Anil persuaded

his parents to let him apply for one of only a few openings available for gifted children at the

Doon School, a prestigious Indian boarding school.  After testing into the school at age 10, Anil

left his family to attend school almost 1,000 miles from home.  See Letter of ███████████,

attached hereto as Exhibit B.

Anil attended the Doon School until he was 16 years old.  In 1970, the school did

not permit students to telephone their families at all; thus, during the school year Anil had little

to no contact with his parents and sister.  The school was so far from Anil's parent's home that in

the five years he attended Doon, Anil's father came to visit him only once and his mother was

not able to visit him at all.  His only contact with his family came via mail.  Yet, as would

become a hallmark of his life, Anil embraced his circumstances and made the most of the

opportunities afforded him.

3

The Doon School helped mold Anil's lifelong dedication to helping others, as it placed a heavy emphasis on public service. It cultivated each student to become a "just and ethical citizen of a global society and being [a] wise and principled leader." Letter of █████, attached hereto as Exhibit C. Anil embraced the school's teachings and thus began his lifelong dedication to helping others. Anil believed the best way to lead was by mentoring the younger students. "When I arrived at school, AK was made my guardian (i.e., my mentor) at the specific request of my father. AK made my transition to boarding school, a traumatic experience, so much easier. He was kind, gentle, always willing to lend a helping hand … I am not sure what I would have done if AK hadn't been there to 'hold my hand.'" Letter of █████, attached hereto as Exhibit D. He was more than a fellow student. Anil was a true leader at Doon. "Anil provided our moral compass … Anil was centered at that young age and displayed integrity and compassion in his dealings and continues to do so today. I had leaned on him then, and still do for guidance in difficult situations." Letter of █████, attached hereto as Exhibit E.

In 1975, Anil graduated the Doon School at the top of his class, attaining the "O" levels, based on the British schooling system. After graduating Doon, Anil, along with over 100,000 student candidates, took the entrance exam for India's finest institutes of higher education, the Indian Institute of Technology ("IIT"). Anil tested in the top 0.1% of applicants and IIT offered him admission.

Anil attended IIT from 1975 to 1980. He approached IIT with the same vigor and dedication he displayed at the Doon School. "[H]e had a reputation for being extremely diligent and conscientious. Whereas others would skip classes and submit assignments late, Anil always attended classes, sat on the front row, made copious notes and then followed up with long hours

4

of hard work. He succeeded as a result of his intelligence and efforts and never wanted or

expected any short cuts to success." Letter of ███████████, attached hereto as Exhibit F.

During his IIT years, the world suffered through its first major energy crisis. At a

relatively young age, Anil recognized that energy would be a major concern for the planet and

that society needed to explore alternative means of providing energy. Thus, still embracing the

Doon School's call to be a "citizen of a global society," Anil aspired to do his share by studying

and researching energy conservation during his senior years at IIT. He focused mainly on solar

energy, believing it would be the most sustainable source of energy. In 1980, Anil graduated

third in his class from IIT, with a degree in mechanical engineering.

In his final year at IIT, Anil applied to and was accepted by the Wharton School

of Business in the United States. At the same time, DeBeers offered the equivalent of the

Rhodes scholarship to one engineering student from among 2,000 graduating students at the five

IITs nationwide. Anil won this scholarship to attend London's Imperial College ("Imperial"), at

the University of London, for a two-year degree in applied mechanics. Having already accepted

Wharton, Anil declined the DeBeers scholarship. IIT Bombay's Dean, however, impressed upon

Anil the prestigious nature of the scholarship and how important it was to the reputation of the

IIT in Bombay that Anil accept the award. In response, Anil sought a two year deferral of his

Wharton admission. Wharton granted him only one. Thus, in 1980 Anil set out to London's

Imperial College to complete the two-year applied mechanics program in a single year.

Anil became the first student to complete Imperial's two-year program in applied

mechanics, including a research thesis, in 10 months. Moreover, he graduated first in his class at

the University of London. Despite Anil's intense schedule, he found time for others. "Anil went

out of his way to take care of students from India who were either not so well off financially or

who were homesick. He would take time off from his studies to help these students and we would learn about these actions not from Anil but from the beneficiaries." Letter of ████, attached hereto as Exhibit G.

After completing the program, his professors encouraged him to stay on for a PhD, which they felt he would complete in just two additional years. Anil, however, had his sights set on Wharton, and the United States, which he believed to be the best place for an education in business management.

In 1981, Anil began his course of study at Wharton. Business school in America was very expensive. Unlike his education at Imperial, which was paid for by DeBeers, Anil did not have a scholarship to Wharton. Anil's family loaned him some initial tuition money. The remaining portion of his education expenses came in the form of loans, not grants, secured from various charitable foundations in India, and his own employment income.

At Wharton, Anil blazed his own trail. He had no interest in finance, which was Wharton's primary specialty, and thus, Anil was among approximately 5% of students who created their own majors. Anil customized his major, as the "management of technology and international business." He focused on the organizational structure of companies operating across cultural boundaries, and the need for fluidity in work processes because of the rapid evolution of technology. At the end of his first year, in 1982, Anil secured a summer job working at Hewlett Packard ("HP") in Germany. Subsequently, he participated in an exchange program between Wharton to the Delft Management School in the Netherlands ("Delft"). The program permitted Anil to continue his studies in the global management of technology at Delft while continuing to work at HP in Germany. He drove to Germany every other week from the

6

Netherlands to work and earn money to defray the tuition and living costs for his second year at business school. After he graduated from Wharton, Anil joined HP on a full time basis.

As is discussed more fully in sections I(D) and II(A) below, Wharton is where Anil first met Mr. Rajaratnam. While they were not friends in school, they knew of each other.

### B. Anil, Malvika and Aman

Before London and the United States, as a college student at IIT in 1975, Anil met the woman who would later become his wife, Malvika. He met Malvika when he came home to visit his parents and was instantly taken with her. Malvika studied psychology in Bombay, 30 miles away from IIT. These 30 miles, which took Anil over 2 hours by bus, train and another bus, could not prevent Anil from trekking from IIT to Bombay to be with Malvika every single weekend for the five years he attended IIT.

In 1981, while he was studying at Wharton, Malvika moved to London to be closer to him. She worked at a halfway house for the mentally challenged and apprenticed with the Richmond Foundation in London. She also took courses at the Tavistock Institute for the mentally ill, and remained in London for two years while Anil finished Wharton.

In 1982, while attending Wharton, Anil proposed to Malvika. ████████████ ██████████████████████████████████████████████████ ████████████████████████████████████ Their plans met with resistance from both sets of parents, who, very much in keeping with Indian customs, ████████████████████ ████████████████████ Undaunted, the two decided to marry and make their future in the United States, away from the conventional norms of India.

Anil and Malvika were married in 1983. They have been married almost 30 years. They have one child, Aman.

Aman Kumar was born on ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████

       The Kumars, then living in California, adjusted their lives immediately and as completely as possible. Malvika gave up her job at Community Living Experiences (a half-way house for the mentally challenged in San Jose, California) and turned to full time care of Aman. McKinsey & Company ("McKinsey"), Anil's new employer, however, did not afford him time off and Anil had to work ████████████████████████████████████████

████████

     ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████

Anil balanced a highly demanding career at McKinsey █████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████ Anil and Malvika, as recent immigrants, had no idea of the community resources available to them.  Thus, the Kumars were left to cope with essentially no support system

█████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████

████████████████████████████████████████ Anil's 100 hour work weeks at McKinsey,

Anil straddled two stressful worlds █████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████

        As will be discussed more fully below, in 1993 a McKinsey partner approached

Anil to move to India and help him start the New Delhi office. The opportunity was appealing

for many reasons, not the least of which was that the Kumars could be near their families to both

offer and receive assistance. Anil and Malvika considered the opportunity very carefully.

███████████████████████████████████████████████ Thus, the Kumars

relocated to New Delhi.

10

The transfer, however, proved to be more difficult for Aman than anyone

anticipated. ███████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ he and Malvika returned to the United States in 1998. Anil could

not yet leave due to ongoing client commitments and continued to live and work in India. He

commuted home to California semi-monthly for nine months. In 1999, Anil returned to the

United States.

███████████████████████████████████████ Aman Kumar excelled

academically. Those close to the Kumar family recognize that Aman has thrived, ███████████

███████████████████ because of the love and support his parents have showered on him, in

particular, Anil. See Letter of ██████████, attached hereto as Exhibit I ("The mental and

emotional strength displayed by Anil was crucial to steer Aman through his development years

and his education."); Letter of █████████ attached hereto as Exhibit J. ("For Anil's part, I

saw him as the kind of father who was never his son's master, but was instead his mentor. He

respected his son's autonomy, and gave Aman the support he needed to forge his own

achievements.). ███████████████████████████████

██████████████████████

> Because of him I never knew an upper bound for excellence, so I
> continually and unknowingly elevated my own expectations of self
> and potential. This was encouraged to sometimes comical degree
> by my father where he could help. [N]obody at home told me that
> fourth graders didn't read *The Economist*, seventh graders didn't
> compute calculus derivatives, and ninth graders didn't win
> arguments on Apple's business strategy against management
> consultants. ██████████████████████████



Letter of ████████, attached hereto as Exhibit K.

      As a direct result of Anil's cultivation, Aman excelled in school, and was named the U.S. Presidential Scholar for California by then President Bush, the Nation's highest award for graduating high school students.  He attended Stanford University, completing a Bachelor of Science and Master of Science in computer science.  The Kumars met each ████████ as a family and were constantly guided by Anil's hand. ████████ Aman flourished, and will start at the Harvard Business School in fall 2012.





██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

The Kumar family has suffered more than its share ████████████████████

████████ Yet, "[d]espite these pressures and responsibilities, Anil displayed a courage and

forbearance in this period that was truly remarkable." ████████████████ Ex. B. Anil

remains, to this day, the anchor for his immediate family in California and in Bangalore. See

████████████ Letter Ex. A; ████████████ letter, Ex. K.

### D. Anil's Professional Life

1983 was an important year for Anil Kumar. He graduated Wharton in June,

married Malvika later that summer and started his full time employment with HP in August.

Anil loved working at HP, where he was a product manager for engineering

applications software. His job entailed making HP's products more relevant to customers, and

therefore, making the products sell better. He thrived in the combined business and engineering

environment. Subsequently, Anil became a market development manager, tasked to help HP

grow into new markets. Anil quickly distinguished himself in this group as a key contributor and

leader. As ████████████████████ notes:

> [H]e demonstrated exceptional communication and creative
> problem solving skills. He successfully addressed the resistance to
> change and inevitable challenges that emerge among established
> marketing, sales, and support organizations in moving individuals
> and organizations to find new and more productive ways to solve
> business problems.... His work ethic overcame the organizational
> environment that lacked sufficient support resources and willingly

15

did everything needed to get the job done ... Anil Kumar is on my personal short list of people from my professional experience who are the "best of the best."

Letter of ████████████ attached hereto as Exhibit P.

Anil's time at HP was to be short lived. After only three years, Anil's colleague's husband told him he was an exceptional problem-solver and that his skills would best be put to use as a consultant. He introduced Anil to a McKinsey recruiter, and after a brief courtship, Anil joined McKinsey's San Francisco office in May 1986.

McKinsey was a huge step in Anil's career.[2] He was not the typical McKinsey recruit in San Francisco–he was not white, had not graduated from Harvard or Stanford, and was not single. Indeed, his superiors seemed disappointed and surprised when, in 1987 as a first year associate, Anil announced Malvika's pregnancy, to become the only associate with a child.

████████████████████████████████████

████████████████ McKinsey's one concession to Anil at this most difficult time was to curtail his travel for a period of months. By the end of 1987, ████████████████████████

████████████████████████████████ McKinsey had Anil traveling for business as usual and Malvika was left to handle Aman alone. Anil had no real ability to object to his situation because, if he left his job, his family would lose healthcare coverage. McKinsey had in place a gold standard health insurance program. Thus, Anil handled the personal and professional balancing act as best he could.

In 1988, a McKinsey partner recruited Anil to assist in opening McKinsey's Silicon Valley office. Anil saw this as an opportunity both personally (to travel less) and professionally (to be in on the opening of a new office). He accepted the position and challenge.

---

[2]  There is little in the way of letter documentation for the McKinsey years because once Anil was arrested his former McKinsey colleagues were instructed to disassociate themselves from him

Indeed, it was a challenge. Without any Silicon Valley clients, Anil and the partner quite literally pounded the pavement. They drove up and down the highway in the partner's car while Anil wrote down the names of the various companies from their signage. He would then cold-call them about business advisory services that McKinsey could provide them. Anil's work bore fruit. Over the next five years, the office grew from only two people to approximately 35 and in 1992 Anil was promoted to junior partner.

In 1993, fresh off his Silicon Valley success, another McKinsey partner recruited Anil to tackle a much more ambitious project--opening McKinsey's New Delhi office. As an incentive, Anil was promised that he would be put in charge of all of McKinsey's practice in India within three or four years. After weighing the personal and professional ramifications of the opportunity, Anil agreed to join the launch team.

The main partner started McKinsey's Mumbai office while Anil opened one in New Delhi. The offices were bare bones--a hotel room, with his family staying at the same hotel for the first year. Projects in India were difficult to obtain because McKinsey partner rates were extremely high, especially by Indian standards. One week of a McKinsey engagement equaled the yearly salary of some Indian company CEO's.

Undeterred by what at times seemed like insurmountable odds, Anil worked long and arduous hours to develop the office. Slowly, but surely, Anil succeeded; he was able to prove his and McKinsey's worth to government agencies, multinational companies, and finally Indian companies themselves. As a direct result of his efforts, the New Delhi office began to flourish, eventually becoming McKinsey's largest Indian office. So successful was Anil that he was made a senior partner, in 1997, in just five years, an achievement accomplished by less than 1 in 100 of all associates joining the firm.

17

Anil believed his star was on the rise at McKinsey. He was, however, wrong. Although, he had been promised the opportunity to run the Indian offices, McKinsey passed Anil over and chose a different partner to run India. This was a devastating blow to Anil's self-esteem and professional future; and he believed he had been deliberately misled by his superiors.

Seeing no future in India, after working so hard for six years, in 1998, Anil returned to the United States. When Anil's clients asked him to stay in India for several more months to complete certain projects, he obliged, as was his nature. Thus, Anil remained in India while Malvika and Aman returned to the United States.[3] When, several months later, Anil returned to California he had no real business practice group to join. Thus, Anil characteristically envisioned the needs for the future, and created his own opportunities. In 1999, he started McKinsey's e-commerce practice and committed himself full time to this initiative.

E-commerce was an untapped practice within McKinsey. As the dot-com era took off, McKinsey began losing its best young associates to the fast-paced, exciting world of e-business. Anil saw the need to quickly move McKinsey into the Internet age and to help stem the tide of associate defections by embracing the dot-com boom. He persuaded McKinsey to dedicate time and money to allow him to build an e-commerce practice group. The practice group was an immediate success, as was Anil. Under his leadership, McKinsey's e-commerce practice grew to represent a full 25-30% of the firm's revenues. Anil saw potential pitfalls in the road ahead. He cautioned McKinsey to limit its exposure to the dot-com craze and have only four "e-business accelerators" (centers with McKinsey project teams that could assist dot-com

---

[3]  Had Anil received the promotion as promised it is likely the Kumar family would have relocated to Singapore, Hong Kong, or other neighboring country                                                              Anil would have, essentially, commuted to and from India, a common practice among other Asian professionals at that time.

companies in getting off the ground). Instead, McKinsey offices globally started approximately 26 "e-business accelerators." Anil became a wary and reluctant hero.

In April 2001, the dot-com bubble burst and along with it 25% of McKinsey's business. McKinsey partners blamed Anil for the dot-com debacle and almost overnight, he became a pariah.

This was particularly difficult for Anil to accept because he had warned McKinsey about its overexposure and nevertheless received the blame. Once again, Anil had no leadership role at McKinsey. This made two serious career setbacks in just a few years. He felt both undervalued and wrongfully ostracized. In 2003, Anil was advised by the senior most McKinsey partners that his future at McKinsey was limited and he should seek employment elsewhere. This was a crushing blow to his self-confidence and sense of self-worth after his decades of dedication to McKinsey.

Nonetheless, he soldiered on from 2003 until 2009, by launching other initiatives at McKinsey. Anil's founded, built and chaired what became a five hundred person outsourcing and offshoring practice, started and chaired a Center for Globalization and joined the Directors Committee to improve the performance of senior partners. In 2003, he once again began to consult for the public company Advanced Micro Devices ("AMD"). Anil recreated himself again ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

█████████

Shattered by his rejection by McKinsey, ████████████████████████████

████████████████████████████████████████████████

19

███████████████████████████████████ Anil in late 2003 and early 2004 was exceptionally vulnerable. Anil confided all of this to his friend Raj Rajaratnam,[4] who, rather than supporting Anil, exploited his weakness.

There is a clear temporal relationship between Anil's latest professional disappointment and the beginning of his consulting for Galleon. In early 2004, Anil agreed to provide Mr. Rajaratnam with insightful, generalized strategic business ideas and nothing else. Providing non-public information was not even discussed. Unsure of his future at McKinsey, stung by the unfair blame he received for the e-commerce failure, ████████████████

████████████████████████████████████ Anil Kumar took a first step away from a life lived completely on the straight and narrow.

E.  Life Purpose of Altruism and Improving the Lives of Others

For the past 25 years. Mr. Kumar has given back with unusual dedication and remarkable success, to philanthropic and charitable causes in India and the US.

i.  Giving Back to India

His desire to give back to his native India is well known among his friends and family. See Letter of ████████████, attached hereto as Exhibit Q. ("Anil told me that he felt a responsibility to try to someday help the people of India who were not as fortunate as he.") Throughout his life, Anil Kumar has given his time and energy to help improve the lives of thousands of Indian citizens. Anil believed the best gift he could give to India was better education. See Letter of ████████, attached hereto as Exhibit R ("[H]e was committed to bringing world-class learning to India.").

---

[4]  The evolution of the relationship between Mr. Kumar and Mr. Rajaratnam is discussed in section II *infra*.

Anil's quest to give back began at the Doon School and The India Institute of Technology. When the Doon School needed money to help its basic infrastructure, "Anil responded utilizing his business and organization skills, hosting many fund raising events to help inject much needed capital to revitalize the school." Letter of ███████████████, attached hereto as Exhibit S.

In 1995, the director of IIT Delhi contacted Anil about an opportunity to improve the IIT's performance. Anil surpassed the director's initial vision, and suggested that the greatest impact would be to double the schools' capacity to educate students. For Indians, an IIT degree is a passport to a vastly better life and set of opportunities. Anil lent his expertise to this project and helped IIT double its student body with no increase to the students' outlay of monies. See Letter of ████████████, attached hereto as Exhibit T ("One of the main challenges at that time was to substantially increase the student strength, which we did from 2500 in year 1995 to 4500 in year 2000.") He accomplished this by, among other things, conceiving a plan to add additional floors to existing dormitories to enable IIT to house more students and to increase class hours to better utilize the infrastructure already in place. Anil helped IIT achieve its goal by voluntarily "using his private time without expecting or receiving any financial benefits." Id. It is one of what is a long history of ambitious projects. Anil feels justifiably proud that 5,000 additional students have graduated from IIT Delhi in the last 12 years, in part, thanks to his vision, aspiration and efforts.

Anil's experience with IIT was so rewarding and education so important to him, that he and a few other prominent Indian businessmen decided that they should start an Indian business school with a focus on developing internationally conversant leaders who would help integrate India into the global economy. Anil was the driving force behind what would become

21

the Indian School of Business ("ISB") – now a world-renowned business school in India.
Indeed, but for Anil, the school would not exist today.  See Letter of ███████████,
attached hereto as Exhibit U ("Anil then went on to help found the Indian Business School in
Hyderabad as a way to bring world class management education to the country"); Letter of
███████████, attached hereto as Exhibit V ("Anil's founder role in the creation of [ISB] is why
it exists today."); ████████████████Letter, Ex. S ("Largely through Anil's painstaking
efforts [ISB] obtained the necessary financing"); Letter of ███████, attached hereto as
Exhibit W ("As a member of the Governing Board of that School … I can say that his dedication
and perseverance were unparalleled and the school owes a lot of its existence and stature to his
tireless efforts."); Letter of ████████, attached hereto as Exhibit X; Letter of ████
███████████, attached hereto as Exhibit Y ("[a] large amount of the credit should go to Anil.
Again, Anil at all times stayed in the background and let others take credit for his significant
contributions.  I would venture to say that a large part of the intellectual vision of ISB is in fact
Anil's, a point not many outside of ISB's leadership will ever be aware of."); see also ████████
████ Letter, Ex. E; ████████████Letter, Ex. R.

   To begin the process of establishing ISB, Anil persuaded several of the leading
businessmen in India and some of his own clients to lend their time, energies, names, and other
tangible and intangible assets to the start-up project.  From the start, Anil worked hundreds of
hours per year for the next 10 years.  This entailed selecting the location; procuring the land;
raising funds (he was successful in personally raising approximately 35% of all money donated
to the school); selecting the architects and contractor; hiring key staff; recruiting the first three
deans; evaluating professors; establishing joint ventures with Kellogg School of Management
and Wharton; cajoling businesses to recruit from an unheard of new school; putting in place

admissions policies; working with intractable bureaucracy and regulations, and more. In short, there was almost no task associated with building ISB in which Anil was not involved.

ISB, as the first international world-class higher education institution in India, is one of Anil Kumar's great contributions to Indian society. Indeed, Anil worked so hard at starting the new business school that 11 year old Aman, when they had to leave India, wondered how the school would continue without Anil. Aman was not the only one impressed by Anil's dedication to the project:

> I remember AK devoting himself to this project, spending countless hours in his spare time ensuring that he could do whatever was needed to make this endeavor a success. His unflagging enthusiasm and energy was infectious. We used to discuss, among my peer group in India, how amazed we were AK, despite having a full-time career establishing an outpost for McKinsey, still had the time, the energy, and the enthusiasm to do what for any normal human being would be a full-time job! He is an inspiring example of what it takes to be committed to the cause of philanthropy and volunteerism and how actions always speak louder than words.

▮▮▮▮▮▮▮ Letter, Ex D. Anil was perhaps the most significant contributor to ISB.

All of the hard work paid off for ISB. In just a few short years, ISB has become one of the best business schools in the world. See Letter of ▮▮▮▮▮▮▮, attached hereto as Exhibit Z. ("Anil has also been one of the founders of the Indian School of Business on whose board I sit. In just over a decade it has become India's leading business school and ISB has been rated as the no. 12 Business School in the World by the Financial Times, London."); see also ▮▮▮▮▮▮▮, Ex. V; ▮▮▮▮▮▮▮ Letter, Ex. Y; ▮▮▮▮▮▮▮ Letter, Ex. D.

Anil has also channeled his energies to the cause of mass education in India and championed ways to better educate those among the 400 million youth who are not currently being well educated. See ▮▮▮▮▮▮▮ Letter, attached hereto as Exhibit AA ("He is always

prepared to commit his assets and resources to the cause of mass education in India"). He is a founding board member of the Bharti Foundation, an organization that has impacted "37,000 underprivileged children (48% girl children) in 253 operational schools [186 primary, 62 elementary and 5 secondary schools] (sic) in villages in six States of India" providing free education to children of families that cannot afford to pay even 50 cents a month for their children's lunches. Letter of ███████████, attached hereto as Exhibit BB.

    ii.   <u>Giving back to California and the United States</u>

       Mr. Kumar volunteered his expertise in and around his home-town in California as well. One of the first *pro bono* tasks Anil undertook, almost 25 years ago, was for the then Mayor of San Jose, ███████████. San Jose was in need of a cultural renaissance. She appointed a task force to revitalize the arts and Anil served as a volunteer consultant to it. "He guided the work of the Task Force through a number of challenges, including ascertaining the need of a fast growing and diverse population, developing a future facilities plan, and establishing a blueprint for how best to support existing and emerging arts groups." ████ ████ Letter, attached hereto as Exhibit CC. Having enjoyed his work with the Task Force and ██████████ in 1989, Anil joined the Boards of the Children's Discovery Museum in San Jose and the San Jose Civic Light Opera to continue to contribute to the revitalization of the arts and culture in San Jose.

       Additionally, in the mid 1990's in Silicon Valley, Anil was a founding charter member of TiE (The Indus Entrepreneurs) an entrepreneurial organization "deeply important in job creation and innovation" around the world. Letter of ██████████, attached hereto as Exhibit CC; <u>see also</u> ██████████ letter, Ex. E. And, in 2005, he founded the Indian American Council

to better connect the Indian diaspora in the United States, to worthwhile causes in India, which would benefit from the diaspora's expertise.

### iii.   Post Arrest contributions in India and the United States

Founding and nurturing a world class international business school, spending years helping to support the arts and entrepreneurship in California, and building philanthropic bridges between the United States and India, would be quite enough of a societal accomplishment for one lifetime. Not, however, for Anil Kumar. Post-arrest, Anil continues to give of himself at a breakneck pace spanning India and the United States, █████████████████

████████████████████████████████████

He is working with Baylor College of Medicine and Max Health in India on a project on "conceptualization and planning of an Academic Medical Centre in India (The Max Institute of Healthcare Education & Research-MIHER). The project involves setting up of a state of the art teaching hospital, research centre and medical, nursing and allied health colleges on a campus in the National Capital Region of Delhi." Letter of ███████████, attached hereto as Exhibit EE.; see also Letter of ███████████ attached hereto as Exhibit FF (describing Anil's vast and invaluable efforts in establishing the medical education initiative with Max India and Baylor College of Medicine). "Anil Kumar's sincerity and passion for "education" was evident. His key contributions over the last ten months have been towards the development of the vision and mission of the project, the operating values and differentiators, model conceptualization, as well as strategic and master planning." ███████████Letter, Ex. EE.; see also ███████████ Ex. FF (noting Anil has been a "wonderful guide, mentor and anchor for this project.").

In addition, Anil has been working without compensation with one of the 10 largest companies in India, the Hero Group, to establish "a multi-discipline University near Delhi that would have eight thousand students getting education in Engineering, Architecture, Business Studies, Liberal Arts and other disciplines for both Under (sic) graduate and graduate studies." ████████████ Letter, Ex. Z. Anil is a donor and volunteer with the Foundation for Excellence, a "nonprofit that provides scholarships in India to exceptionally talented students who come from families that earn less than \$7 a day." Id. In the past two years, Anil has been successful in getting the 12,000 + foundation fellows who received full college tuition in the past to donate money back to that program so that others can prosper as they have. Id. Anil persuaded ████████████, owner of the India's ████████████, ████████ Hotels, to establish 50 annual scholarships to IIT for poor children, especially girls. See ████████████ Letter, attached hereto as Exhibit GG. Moreover, after Anil brought to Mr. ████████ attention the fact that 12.5 million Indian citizens are mute and fewer than 100,000 have jobs, the two have spearheaded an initiative to make ████████ the largest employer of deaf and mute people in India. See Id. On ████████ behalf, Mr. Kumar has pledged to set up and mentor two initiatives, again on a *pro bono* basis, which can help train deaf and mute people for employment in the hotel/restaurant industry. He is working with Mr. ████████ to conceptualize and establish vocational training institutes "to offer employability skills to some of India's 100 million + kids who are currently dropouts from the Indian school system." Id.

In the United States, Baylor College of Medicine also benefited from Anil's *pro bono* work. When, in 2010, it was under significant financial distress and needed management and organizational help, its President and CEO, Dr. Paul Klotman, turned to Anil who

immediately volunteered to assist Baylor with its turnaround. During the most critical periods, for about a year, Anil flew to Houston every two to three weeks to work with Baylor to improve its organizations' effectiveness and initiate a global education outreach program. Dr. Klotman previously acknowledged that had Baylor retained a team of consultants of Anil's seniority and caliber for the projects, the fees would have been several million dollars.[5]

Mr. Kumar has recently agreed to become an unpaid faculty member at the Abramson Center for the Future of Health at the University of Houston. His mandate is to work with the entity "in the development of new strategies for improving the health" of populations in under-resourced environments. Letter of ████████████████, attached hereto as Exhibit HH. Anil is helping organize the first Health Innovations conference to be held on Nov 7-9, 2012 in Houston, and is on the Program Committee.

Mr. Kumar continues to contribute his time and skills to the furtherance of education in the United States as well. Although his offers to assist various schools for the disadvantaged in Silicon Valley were rejected due to the notoriety of the Galleon case, he finally learned that former San Jose Mayor ███████████ had started a charter school and offered his services. "[W]hen he heard about a new charter middle school in San Jose, that I had co-founded, he asked what he could do to help. Because of his insight into education reform, he is now an ongoing community adviser to me and our executive director." ████████████ Letter, Ex. CC. Moreover, Anil "is working with 8th graders in disadvantaged communities to teach

---

[5] Anil's relationship with Baylor has not worked out as he was led to believe. When Mr. Kumar began his *pro bono* work for Baylor, President and CEO Dr. Klotman told Anil he would write to the Court describing the work Anil did for the school. Long after Mr. Kumar had done his work, lawyers for the Board of Directors prevented Dr. Klotman from signing the letter he had already written to this Court. Shortly thereafter, Dr. Navneet Kathuria, also associated with Baylor, withdrew the letter he already sent to counsel on Mr. Kumar's behalf. Baylor's lawyers' position was that although Anil had worked for Baylor on a *pro bono* basis, the potential negative press was too great a risk to Baylor for Dr. Klotman to make good on his promise. Sadly, this mistreatment on Baylor's part is not atypical of Mr. Kumar's post-arrest experiences from other organizations as well.

them how to converse, build relationships and carry themselves in social and professional settings. This unique class boosts kids' confidence and provides them with critical social skills they need to succeed in the workplace and beyond." Letter of ████████, attached hereto as Exhibit II. Anil's contributions are on numerous levels; not only does he work with the students, but also with the school itself, which is looking to expand thanks to its social impact and success. "Anil's help in that area has had a significant impact. He has worked with me personally on such issues as developing a business plan, fundraising, strategic marketing, and has been a thought partner as ACE tries to position itself for growth." Letter of ████████, attached hereto as Exhibit JJ. Mr. Kumar is, of course, volunteering his time to this cause as well.

Charitable work has been and will continue to be a large part of Mr. Kumar's life. He knows that the best chance for redemption in the eyes of all those who matter to him, and for himself, is to work hard for his community and society and continue to put others' needs before his own.

## III.   THE OFFENSE CONDUCT

### A. Mr. Kumar's Relationship With Mr. Rajaratnam

Anil Kumar first met Mr. Rajaratnam at the Wharton Business School in 1982, when he was 24 years old. They were not friends, moved in different circles, and had different academic areas of focus and interest; Mr. Rajaratnam in finance and Anil in technology management.

It was not until approximately 1988-1989 that Messrs. Kumar and Rajaratnam met again, this time as professionals, Anil, a McKinsey associate and Mr. Rajaratnam a Needham Capital technology analyst. As an analyst, Mr. Rajaratnam traveled to California to visit companies and their CEO's. On one such trip, Mr. Rajaratnam reached out to Anil. It was

here they first found common ground because Mr. Rajaratnam covered one of Anil's clients,

AMD. Between 1988 and 1993, their relationship consisted of meeting once or twice a year and

a few telephone calls.

The relationship did not evolve until 1999, after Anil returned from his years in

India and Mr. Rajaratnam started the Galleon Group. Mr. Rajaratnam, having started his own

hedge fund, reached out to Anil more frequently over the next five years. Now that the two were

working in the same sector, technology companies and the internet, they developed a more

substantial relationship. Indeed, in 2001, Mr. Rajaratnam generously donated $1 million to

Anil's principal passion, The Indian School of Business, which resulted in Anil believing that

Mr. Rajaratnam was selfless and well-intended.

By 2001, Mr. Rajaratnam had become widely recognized as having built the

country's leading technology hedge fund. In 2002, Mr. Rajaratnam asked Anil for a McKinsey

proposal to consult on a project for Galleon. Ultimately, Mr. Rajaratnam was not responsive to

the McKinsey proposal.

It was not until September 2003 that Mr. Rajaratnam first attempted to corrupt

Anil Kumar. At a benefit dinner in New York, Mr. Rajaratnam proposed a consulting

relationship between Galleon and Anil Kumar as an individual. Mr. Rajaratnam made it clear

that he did not wish to engage McKinsey because the previous proposal had not been of a high

quality. He noted that Galleon had a $100 million budget for market research and would benefit

from Kumar's sharp intellect. Mr. Rajaratnam offered to pay for what Mr. Kumar believed was

intellectually oriented technology industry insights and market trend information. Mr. Kumar

explained that while there might be numerous McKinsey partners who provided advice on the

29

side, McKinsey would frown upon his doing so. As a result, he declined to act as Galleon's consultant.

At around that same time, Mr. Rajaratnam suggested that Anil invest in the Galleon funds because they were doing very well. Mr. Kumar, who was a sophisticated consultant but not a sophisticated investor, had most of his money in a savings account earning minimal interest. He agreed to invest $250,000 in Galleon and wrote a check to Mr. Rajaratnam that Mr. Rajaratnam promised to deposit in a domestic Galleon account for Mr. Kumar's benefit.

Within days of the investment, Mr. Rajaratnam revisited the idea of Anil consulting for Galleon on the side and recommended a complicated payment route whereby the payments would be held within Galleon's own funds, so that McKinsey would not be privy to the arrangement. To his eternal regret, Anil agreed.

Initially, Anil gave Mr. Rajaratnam legitimate technology trend ideas. This type of trend information proved not to be of primary interest to Mr. Rajaratnam.

Mr. Rajaratnam sought information of a different nature and kind from what Anil initially believed he was being paid to provide – Mr. Rajaratnam wanted material nonpublic information. At first, he did not overtly press Anil for such information. However, Mr. Rajaratnam knew that Anil was in a vulnerable state of mind because Anil had revealed his various career and personal disappointments; Mr. Rajaratnam capitalized on this vulnerability. Knowing Anil was feeling underappreciated, and uncertain of his future at McKinsey, Mr. Rajaratnam repeatedly noted that analysts knew more about companies than consultants, and that he, Mr. Rajaratnam, knew more about Mr. Kumar's clients, in particular AMD, than Anil himself knew. These not-so-subtle gibes called into question the very essence of Anil's professional life–knowing his clients' better than anyone else and helping shape their strategies. Mr.

30

Rajaratnam, to prove his point, revealed to Anil non-public information the former had learned from his own sources. Anil fell prey to Mr. Rajaratnam's manipulation and ultimately provided confidential information, in part, to prove to Mr. Rajaratnam that he knew his clients as well or better than Mr. Rajaratnam and to validate his professional standing in Mr. Rajaratnam's eyes.

Through Anil, Mr. Rajaratnam targeted AMD information, even though Mr. Rajaratnam had other sources of AMD information. In 2004, Anil began confirming information that Mr. Rajaratnam claimed to have received about AMD. Later, Mr. Rajaratnam sought more detailed information and information not simply confirmatory of what he previously had obtained.

In 2005, Anil continued his pattern of providing high-level industry trend ideas interspersed with AMD strategic business information.

In 2006, Mr. Kumar informed Mr. Rajaratnam that AMD was going to require graphics technology capability and would likely need to acquire it. What began as a general "industry insight," eventually bled into Mr. Kumar revealing the timing of the deal and the identification of ATI as the acquisition target. Mr. Rajaratnam also obtained this information from Galleon analyst Adam Smith, who has pleaded guilty, and others under investigation, including the investment banker on the deal.[6]

In 2007, Anil provided no inside information to Mr. Rajaratnam. In the middle of 2008, Mr. Rajaratnam hired McKinsey to advise Galleon. While negotiating the deal and working on that McKinsey project from March to October 2008, Anil again provided Mr.

---

[6]  This is noted not to avoid responsibility but to provide the Court with insight into the power over others Mr. Rajaratnam successfully wielded.

Rajaratnam inside information.  Mr. Kumar told Mr. Rajaratnam that eBay was set to lay off staff, prior to the public disclosure of the event.

Mr. Kumar also provided information about AMD.  This time the information centered on the fact that a sovereign-wealth fund, Mubadalla, was considering investing in AMD.  Although the investment by the fund was not a secret, and Mubadalla had sought out Mr. Rajaratnam's advice prior to the deal, Anil provided Mr. Rajaratnam with updates as to the expected date of consummation.  As before, Mr. Rajaratnam claimed to have better sources and knowledge about this transaction, and told Anil that the AMD CEO, as well as a top executive at IBM, was providing more detailed and financially useful updates on the progress of the Mubadalla investment to another of Mr. Rajaratnam's coconspirators, Danielle Chiesi, who in turn was conveying this to a number of her friends.[7]  In this context, Anil then informed Mr. Rajaratnam of the timing, several days ahead of the announcement.

In an otherwise law-abiding life, Anil Kumar was blind to Mr. Rajaratnam's ability to manipulate.  The professional disappointments for a man used to being among the highest of achievers, the personal uncertainties of his ███████████████████████, and ██████████████████████████████████, has described,[8] all contributed to an inability to say "no" to Mr. Rajaratnam.  Indeed, Mr. Rajaratnam masterfully cultivated in Anil a kind of dependence, by reassuring Anil that he would always have a place with Mr.

---

[7]  Mr. Rajaratnam never disclosed his trades to Mr. Kumar.  Post arrest, Mr. Kumar learned that Mr. Rajaratnam traded on three events over the 2004 to 2008 period (AMD/ATI in 2006, AMD/Mubadalla in 2008 and eBay in 2008).

[8]  See ███████████████████████ *infra* at III (C).

Rajaratnam.[9]  This furthered the connection, deepened the manipulation and extended Kumar's sense of indebtedness to Mr. Rajaratnam.

Mr. Kumar was arrested on October 16, 2009.  He began cooperating with the government in December 2009 and pleaded guilty in January 2010.  He has been actively cooperating with the United States Attorney's Office and the Securities and Exchange Commission for over 30 months.  See infra section IV.

B.  The Payment From Mr. Rajaratnam and Galleon

Mr. Rajaratnam offered to pay Anil $125,000 a quarter to be a private consultant to Galleon, knowing that Mr. Kumar was widely regarded as one of the smartest and best technology consultants in his profession.  He told Anil "you work very, very hard, you travel a lot, you are underpaid, people have made fortunes while you were away in India and you deserve more.  So, for all your insights, just keep track of your knowledge in the industry and share it with me and you have such good knowledge that it is worth a lot of money to me."

Ultimately, Mr. Rajaratnam paid Kumar $750,000 for 2004 and 2005, plus an end of year bonus of $1 million in 2006.  Anil Kumar never spent or even accessed a single cent of that money.  Money, as such, was not a motivating factor in Anil's providing Mr. Rajaratnam with material non-public information.  To better understand his motivations and conduct, Mr. Kumar sought medical help immediately after his arrest.

---

[9]  Indeed, in 2006 Mr. Rajaratnam and Mr. Gupta offered Anil an opportunity to leave McKinsey and join them in a soft landing spot called New Silk Route ("NSR").  NSR was a private equity and hedge fund started by Mr. Rajaratnam, among others.  Mr. Kumar was offered a partnership on the condition he left McKinsey.  Mr. Kumar postponed the decision of whether to join NSR until after 2010.





## IV.   SENTENCING ANALYSIS

Section 18 U.S.C. § 3553(a)[10] controls sentencing in criminal cases.  As part of its

§3553(a) analysis, the Court must consider the United States Federal Sentencing Guidelines (the

"Guidelines").  See United States v. Crosby, 397 F.3d 103, 103 (2d Cir. 2005).  The 2009

Federal Sentencing Guidelines is the applicable version in the instant case.

---

[10] Section 3553(a) provides that: "The court shall impose a sentence *sufficient, but not greater than necessary*, to comply with . . . (2) the need for the sentence imposed:  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]"  18 U.S.C. §3553(a) (emphasis added).

Mr. Kumar pleaded guilty to a two count Information. Pursuant to §3D1.2 the counts are grouped together.[11] Pursuant to §2B1.4 (Insider Trading), the base offense level is 8. Section 2B1.4(b) refers to the §2B1.1 for a calculation of the gain. Because Mr. Kumar received $1.7 million from Galleon, the increase to the base offense level is 16 levels, more than $1,000,000 but less than $2,500,000. Mr. Kumar pleaded guilty and cooperated with the government from a very early point and thus pursuant to §3E1.1 (a) & (b) he is entitled to a three level reduction for acceptance of responsibility. As a result of this calculation, Mr. Kumar submits that his Guidelines calculation level is 21. Mr. Kumar has no previous criminal record and therefore belongs in Criminal History category I of the Guidelines. As a starting point, level 21, under Criminal History Category I equates to a sentencing range of a maximum of 37-46 months.

As this Court well knows, "the Guidelines are guidelines—that is, they are truly advisory," and hence this Court is "generally free to impose sentences outside the recommended range." United States v. Cavera, 550 F.3d 180, 188 (2d Cir. 2008) (en banc). "A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." Id.; see also United States v. Stewart, 590 F.3d. 95, 153 (2d Cir. 2008) (explaining that "a sentence outside the Guidelines carries no presumption of unreasonableness" and the "Guidelines are only one of the factors to consider when imposing sentence"). Under this framework, "[i]n addition to taking into account the Guidelines range, the district court must form its own view of the 'nature and circumstances of the offense and the history and characteristics of the defendants.'" Cavera, 550 F.3d at 188 (citing 18 U.S.C. § 3553(a)(1)).

---

[11] Grouping is proper under any subparagraph of § 3D1.2: (a) the counts involve the same transactions, (b) was a part of a common scheme, and/or (c) the calculation is guided by loss amount.

"[A] district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." Cavera, 550 F.3d at 189 (footnote omitted); see also Gall v. United States, 128 S. Ct. 586, 598 (2007). In considering the § 3553(a) factors, sentencing courts should give no greater weight to the Guidelines calculation than any of the other factors. See United States v. Kimbrough, 128 S. Ct. 558, 570 (2007); see also Simon v. United States, 361 F. Supp. 2d 35, 40 (S.D.N.Y. 2005). In the post Booker era, the Court must "consider all of the § 3553(a) factors" and "must make an individualized assessment based on the facts presented." Kimbrough, 128 S. Ct. 596-97.

There are, at least, eight separate grounds on which this Court is empowered to grant Mr. Kumar a downward variance to a probationary sentence. They are:  1) extraordinary cooperation with the United States Attorney's Office and SEC; 2) facilitating the proper administration of justice; 3) ███████████████████████; 4) lifetime of good works; 5) the permanent curtailment of good work that incarceration will cause, particularly in India; 6) post offense rehabilitation; 7) extraordinary family circumstances; and 8) the punishment and suffering already endured by Mr. Kumar and his family.  In this case, each, standing alone, would merit utmost leniency.  When considered together, they present an overwhelmingly compelling case for a non-incarcerative sentence.  What follows is a detailed analysis of each of the reasons that the just and fair sentence in this case is probation.

A. Mr. Kumar Has Provided Extraordinary Assistance to the Government

Section 5k1.1 of the Guidelines provides that "[u]pon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines."

When the government makes a 5k1.1 motion based on the defendant's cooperation, there is no limit to the court's authority to depart downward from the Guidelines range. See United States v. Speed Joyeros, S.A., 204 F.Supp. 2d 412, 427 (E.D.N.Y. 2002) (stating that if the government submits a §5k1.1 letter, the court can grant probation even in the most serious case) (Weinstein, J.); United States v. Stewart, 590 F.3d. 95, 141 (2d Cir. 2008) ("And of course, use of a defendant's cooperation to justify significant variances and departures from the otherwise applicable Guidelines calculations is commonplace.")

To say that Mr. Kumar's cooperation with the United States Attorney's Office was substantial is to understate its importance in several criminal prosecutions. While Mr. Kumar testified for the prosecution in two separate trials, his cooperation ran much deeper. He was the most important witness in the highest profile criminal insider trading case in the past 20 years. Additionally, Mr. Kumar cooperated with the SEC and has supplied substantial assistance to it in its investigations and cases as well.

    i.   United States v. Rajaratnam

Shortly after his arrest, Mr. Kumar faced the consequences of his conduct and made the decision to plead guilty and assist the government in its prosecutions.

Mr. Kumar understood that his decision to cooperate would have negative repercussions, not the least of which was that he would have to testify against his former classmate and friend Mr. Rajaratnam and potentially his mentor Rajat Gupta, both of which came to pass. It meant too, the loss of his job, countless friends, the respect of peers and colleagues, and his carefully built and hard-earned international reputation. Nevertheless, in the aftermath of his participation in the instant criminal conduct, Mr. Kumar wanted to right his wrong and to

accept the consequences of his actions. He understood that the first step was to admit his illegal actions and assist the government in bringing the mastermind of the scheme to justice.

Mr. Kumar's cooperation began in late 2009 and continued until June 2012. During the course of the approximate 30-month cooperation, Mr. Kumar has been available to both the US Attorney's Office and the SEC on every occasion requested, whether in person, via telephone, or through his attorneys. Between proffer sessions, trial preparation, and days of testimony, Mr. Kumar has met with the government on over 20 different days in person and an additional half dozen on the telephone. During the course of his cooperation for the Rajaratnam trial, he spent over 50 days and hundreds of hours reviewing thousands of documents at the U.S. Attorney's Office's request. In a case that had millions of pages of documents and emails, part of Mr. Kumar's task was to identify for the government which documents he believed were relevant to the criminal scheme. He also listened to over 50 wire-taps associated with the case and the defendants, and helped the government interpret and correct the transcripts.

In March 2011, Mr. Kumar testified in United States v. Rajaratnam. Mr. Kumar was the government's chief witness. He testified for four days and endured hours of relentless cross-examination while Mr. Rajaratnam's attorney tried to destroy his credibility. Solely in preparation for his trial testimony he met with the government on over 10 different days, often doing so at 6:00 a.m. because early morning better suited the prosecutor's schedule.

His trial testimony was at the center of the government's case against Mr. Rajaratnam. Mr. Kumar expertly explained to the jury how he had come to be a part of a criminal conspiracy, and spent many hours carefully and credibly interpreting emails and wire taps for the jury.

ii.   United States v. Gupta

After his testimony in the Rajaratnam case, Anil began to anticipate sentencing in the summer of 2011. Each time he contacted the US Attorney's Office to set a sentencing date he was told he had to wait, the government might have further need for his testimony. Requests to confirm the sentencing date in June, July, and September, were met with the response that the government could not confirm the date. Finally, in October 2011, Anil was told that he might be a witness in the Rajat Gupta trial and that his own December 2011 sentence would be adjourned.

Mr. Kumar was crushed because he had worked for Mr. Gupta, was a friend of Mr. Gupta and his family, and had held him in high esteem as the CEO of McKinsey. However, Anil had an obligation to cooperate with the government and planned on fulfilling that responsibility without complaint.

Again, Anil cooperated to the utmost of his ability. He reviewed documents, had in person and phone proffers with the government, and met with them on numerous occasions in preparation for the trial. In total, he met with the US Attorney's Office and SEC over fifteen times in preparation for the Gupta testimony. This included at least seven visits to New York from California after the Rajaratnam testimony.

On June 1 and June 4, 2012, Mr. Kumar testified against his former boss and mentor Rajat Gupta. It was grueling in a different way than his testimony against Mr. Rajaratnam, not because the cross examination was as long as in the previous trial, but because Anil knew that he could be partially responsible for helping to convict someone with whom he and his family had deep and long lasting ties.

iii.   Application of Mr. Kumar's Cooperation

Under the Guidelines, the Court must take into consideration the following: (1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered; (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant; (3) the nature and extent of the defendant's assistance; (4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;[12] and (5) the timeliness of the defendant's assistance. In each category, Mr. Kumar deserves the highest possible marks and the greatest credit.

The government's 5k letter will be of great assistance to the Court's effort to evaluate the significance and usefulness of Mr. Kumar's cooperation. During his cooperation, he provided the government with information about which it was previously unaware, including conduct in which he himself had engaged. As an example, it is very unlikely that the government would have been able to uncover the history and the route of the illicit payments Galleon made on Mr. Kumar's behalf without his assistance. Virtually everyone who knew anything about the payment mechanism resided outside the United States or worked for Galleon and declined to assist the government. The government also learned from Mr. Kumar, not the wiretaps, that he had tipped Mr. Rajaratnam in 2006 about the AMD/ATI transaction. Based on this information, the government revised its charges against Mr. Rajaratnam to include the ATI transaction. Ultimately, the original charge on which Mr. Kumar had been arrested - the Mubadalla investment in AMD - was not included in the final Rajaratnam Indictment. It was

---

[12] Mr. Kumar and his family were not, as far as he is aware, at risk of injury or in danger resulting from his assistance. That said, there is always danger, in some form, to a defendant when he cooperates against powerful men. And it is noteworthy that the Kumar family has suffered in ways that are atypical of cooperators (as is discussed *infra* at section IV (B)).

Mr. Kumar's personal revelation about ATI that became the cornerstone of the Rajaratnam charges.

The truthfulness, completeness, and reliability of Mr. Kumar's information and testimony was aptly demonstrated by the jury convicting Mr. Rajaratnam. Moreover, Mr. Kumar's cooperation was not the kind in which the truth emerged slowly and painstakingly, as is often the case in such matters, and which can unduly waste resources. Mr. Kumar cooperated as fully and truthfully on day one as he did in month 30.

In addition, Mr. Kumar extensively assisted the government during his cooperation. He met with the government or did analysis on its behalf for almost 100 days in connection with the charges and testimonies for the Rajaratnam and Gupta trials, in the past 30 months. He applied himself in the first several weeks post arrest to reviewing over 10,000 emails from 2000 to 2009 from the McKinsey email system. He assisted the government with supporting facts, arguments, timeframes, and by analyzing innumerable emails, documents, over 3,000 calendar entries, phone records, and more.

Mr. Kumar testified at two trials for a total of six days and prepared for the testimony over the course of several months. He provided the government with insight and analysis of documents and facts that otherwise might have gone undiscovered or misunderstood. It is clear that the nature and extent of his cooperation has been extensive.

Mr. Kumar's cooperation was timely as he cooperated almost immediately after his arrest. He was the first of the people with whom he was arrested to cooperate. The timing and impact of Mr. Kumar's cooperation is discussed further *infra* in section IV (B).

Mr. Kumar has been a model cooperator and much more. He has excelled at every aspect of his cooperation and for the reasons discussed above and below, we submit that his cooperation warrants a strong consideration of leniency.

It is also worth noting the sentences of similarly situated cooperating defendants. Over the past few months, numerous cooperating witnesses have been sentenced in white collar criminal cases in the Southern District of New York. Some relevant sentences are illustrated below as a point of reference for the Court.

> Adam Smith: began cooperating with the government in November 2010 – a full year later than Mr. Kumar. Mr. Smith pleaded guilty on January 26, 2011. He assisted the government in its case again Mr. Rajaratnam. He testified at the Rajaratnam trial, the week after Mr. Kumar. Subsequent to Mr. Rajaratnam's arrest, Mr. Smith left Galleon and opened his own hedge fund, Rose Lane Capital, where he continued to commit insider trading for a year until his arrest. On June 26, 2012, Mr. Smith received a two year probationary sentence.

> David Plate: pleaded guilty in July 2010. He began cooperating with the government in the case against Zvi Goffer. The Goffer case was an off-shoot of the Galleon insider trading investigation. Mr. Plate testified against Mr. Goffer. In November 2011, he received a three year probationary sentence.

> David Slain: began cooperating in 2007 and pleaded guilty in December 2009. He assisted the government in the Zvi Goffer investigation. Mr. Slain was a key witness at the Goffer trial and the government credited his cooperation with leading to numerous guilty pleas. Mr. Slain received three years of probation and 300 hours of community service.

> Gautham Shankar: also connected to the Galleon insider trading cases, pleaded guilty in 2009 and cooperated with the government thereafter. Mr. Shankar did not testify at the Goffer trial. Nevertheless, he received three years of probation, which included six months of home confinement.

> Don Chu: pleaded guilty in the Primary Global Research criminal cases. He cooperated with the government but did not testify at any trials. Mr. Chu received two years of probation.

> Matthew Devlin: in a matter unrelated to the Galleon insider trading case, pleaded guilty to securities fraud for stealing corporate secrets from his wife and sharing them with friends. He assisted the government in obtaining four convictions. After three years of cooperation, Mr. Devlin received three years of probation. Mr. Devlin did not testify at any trials.

Courts in the Southern District granted each of these men probationary sentences because their cooperation was extensive and fruitful. The individual 5k1.1 letters and statements from the government describe the ways in which these cooperating defendants provided value.[13] Mr. Kumar's cooperation embodies all of the qualities of the individuals discussed above and in footnote 13: he provided information to the government it could not have gotten elsewhere, cooperated early, helped secure multiple convictions and guilty pleas and more. Without him it would have been very difficult and time and resource consuming for the government to succeed in the Mr. Rajaratnam case. He cooperated virtually from the first available moment. The work he did was nothing short of extraordinary. Therefore, we respectfully submit that Mr. Kumar should be treated in the same manner as the above cooperating witnesses and receive a probationary sentence.

B. Mr. Kumar's Guilty Plea Facilitated the Proper Administration of Justice

In a multi-defendant case, a defendant who enters an early guilty plea and cooperates, thereby inducing other defendants to plead guilty, assists not only the government, but also the court. As the Second Circuit has recognized, where a defendant's conduct "'broke the logjam' in a multi-defendant case," his "activities facilitated the proper administration of justice in the District Courts." United States v. Garcia, 926 F.2d 125, 128 (2d Cir. 1991). In Garcia, the court held "additional assistance rendered the court in the disposition of charges

---

[13]   See Forbes.com: Former Galleon Trader and Govt Informant, Adam Smith, Sentenced to Probation, (June 26, 2012) (The government stated that "Smith's cooperation with the Government has been nothing short of extensive, substantial, and significant."); see also Bloomberg.com: David Plate Gets Three Years' Probation in Galleon Insider Trading case, (Nov 2, 2011) ("'He was really able to provide information we had from no other witness,' said AUSA Andrew Fish"); Ex-Lehman Broker Devlin Sentenced to Three Years' Probation, (Mar 24, 2012) ("AUSA Reed Brodsky said "Had [Devlin] not cooperated, it would have been extremely difficult to have brought actions against the tippees."); Ex-Galleon Trader Slain Who Led U.S. To Probe Mr. Rajaratnam Gets Probation, (Jan 21, 2012) ("U.S. Attorney Preet Bharara called [Slain's cooperation] 'nothing short of extraordinary.'"); Galleon Insider Figure Gets Probation After Leniency Bid, (April 19, 2012) (quoting AUSA Fish as stating that Shankar's cooperation was "substantial" and that he cooperated "immediately").

against the other defendants justified the departure from the Guidelines." Id. at 128. Indeed, in

United States v. Bobb, 1993 WL 8653, *2 (S.D.N.Y. 2003) the Court recognized that timely

guilty pleas in what would otherwise have been a lengthy criminal prosecution may be a

"mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the

Sentencing Commission in formulating the guidelines" – in short, a separate and distinct basis

for a downward departure. Mr. Kumar's early plea and cooperation both broke the logjam and

assisted in facilitating the proper administration of justice beyond the extent considered by the

Sentencing Commission and therefore deserves special recognition.

On October 16, 2009, the FBI arrested Messrs. Kumar, Rajaratnam, Goel, Moffat,

Kurland and Ms. Chiesi. Over the ensuing two months no defendant arrested that day began

cooperating with the government or, as far as Mr. Kumar is aware, manifested any intent to plead

guilty without cooperation. It was not until Mr. Kumar stepped forward and admitted his guilt

that the other defendants started to follow suit. After Mr. Kumar pleaded guilty, Messrs. Goel,

Kurland and Moffat, as well as Ms. Chiesi pleaded guilty.[14] Mr. Kumar was something of a

lynch-pin to the criminal case; it is not a coincidence that several defendants pleaded guilty in the

immediate aftermath of his cooperation with the government.[15] Mr. Kumar respectfully suggests

that the Court take this into account, as Mr. Kumar can be seen to have helped facilitate not only

---

[14]   Several weeks after the October 16 arrests, 14 additional people were arrested in connection with another
Galleon criminal insider trading case. Of the 14, all but 3 pleaded guilty, after Mr. Kumar. The remaining three
were convicted at trial. This is not to suggest that Mr. Kumar was responsible for any or all of the pleas, merely to
note that Mr. Kumar cooperated first among those arrested in October and November of 2009, and no one pleaded
until after he did.

[15]   Mark Kurland pleaded guilty on January 27, 2010; Rajiv Goel pleaded guilty on February 8, 2010; Robert
Moffat pleaded guilty on March 29, 2010; and Danielle Chiesi pleaded guilty on January 19, 2011. With the
exception of Ms. Chiesi, who pleaded guilty only after the court had decided not to suppress the wiretap evidence,
each defendant with whom Mr. Kumar was arrested, pleaded guilty within three months of his plea.

Mr. Rajaratnam's guilty verdict, but also the guilty pleas of four defendants with whom he was arrested, and many others arrested later.

C. Mr. Kumar's ████████████ Warrants a Downward Variance

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

████████████████

████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████







[REDACTED]

   D.  Mr. Kumar's Lifetime of Good Works Warrant Leniency

It has been well detailed above that Anil Kumar has worked tirelessly and

extensively for the broader community and the individuals therein.  It is equally as true that Anil

has given of himself, through his time and energy, to the many people in his life who have

needed his help.  His remarkable donations of time and creative thought, more so than money,

have always characterized his contributions to society.

Anil's exceptional, current, and on-going dedication to the Indian School of

Business, Bharti Foundation, Foundation for Excellence, Max Institute of Health Education and

Research, BML Engineering and Science University, ACE charter school, South Asia Heart

Center, workplace and vocational opportunities for the deaf and mute, among others, is relevant

because courts are permitted to impose more lenient sentences in cases of extraordinary

community and/or charitable service, than in cases where no such mitigating factors exist.  See

United States v. Shuster, 331 F.3d 294, 296 (2d Cir. 2003); United States v. Serafini, 233 F.3d

758, 772 (3d Cir. 2000); United States v. Crouse, 145 F.3d 786, 791 (6th Cir. 1998).

      Mr. Kumar's dedication to charitable works has been well documented in the

letters, and does not require repeating.[16]  Suffice it to say that "[h]e is an inspiring example of

what it takes to be committed to the cause of philanthropy and volunteerism and how actions

always speak louder than words." ██████████Letter, Ex. D.  "Unusual for a McKinsey

partner, he devoted a substantial fraction of his time to non-profit causes." █████

██████████Letters, Ex. U.  "Anil is financially philanthropic, but his most important

contributions have been his time and considerable talent to much needed social causes." █████

██████Letter, Ex. E.

      When considering leniency based on extraordinary community or charitable

activities, one court has held that "[t]he focus should be on the defendant's activities, understood

in the light of his career and resources, particularly those that go beyond the kind of 'impersonal

writing of checks' that characterized many wealthy individuals." United States v. Mehta, No.

Crim.01-10180-NG, 2004 WL 418119 at *6 (D.Mass March 3, 2004).  The dedication to

community and the people therein, often at his own expense, sets Anil Kumar apart from most

community minded people and warrants leniency from the Court for outstanding community

service.

---

[16]  Some examples of his dedication to helping the broader community are as follows:  his work with Baylor
College of Medicine and Max India to establish a medical school in India, (██████████Letter Ex. EE and ██
██████████Letter Ex FF); The Doon School to rebuild its infrastructure when it was crumbling, (████and
██████Letter, Ex. S); the Indian Institute of Technology to assist it in serving more students without
increasing its costs (██████████Letter, Ex. T ); The Abramson Center for the Future of Health, to help
develop better health access technologies for the underprivileged people Abramson serves, (████████████
██████ Ex. HH.); the ████████Hotel chain in aiding to train deaf and mute Indians to work in the hotel business,
(██████████████Letter, Ex.GG); the Satya Bharti School Program to help educate the poorest segments
of India, girls in particular, and more (██████████Letter, Ex. O).

United States v. Serafini, 233 F.3d 758, 772 (3d Cir. 2000) has a fact pattern that

most closely resembles the instant case. In Serafini, the Third Circuit upheld a downward

departure based on Serafini's efforts to establish a fund to defray the cost of a bone marrow

transplant for an individual, arrange for transportation to the hospital for a different individual,

assist a third individual to pay his electric bill so service would not be discontinued, and more.

The Third Circuit believed these types of personal activities warranted consideration for and

ultimately the granting of leniency. Id. at 774-75.

Anil Kumar's past is filled with as many small acts of kindness of the type that

the Serafini Court found compelling as larger society changing ones. Many of the letter writers

have told the Court how Mr. Kumar has helped them when they needed it. This character trait is

what best describes Anil Kumar. See ▮▮▮▮▮▮▮▮ Letter, Ex G, ("This deep desire to help is

the most defining aspect of the Anil we all know"); see also Letter of ▮▮▮▮▮▮▮▮▮, attached

hereto as Exhibit LL. ("[I]f it is within his means to help no matter how small he would do it.");

see e.g.,

> "I always appreciated Anil's support and guidance during my many years of raising the
> children as a single mother … [w]hen I was hospitalized during a work assignment in
> London, Anil made it a point to visit me during a short layover en route to his destination
> in another country. He had to reschedule his meetings to come and see me; but that is
> Anil, no burden is too big and no request too small. ▮▮▮▮▮▮ Letter, Ex I.

> Anil Kumar in his personal capacity helped me in various ways. From driving me around
> on week-ends to finding a suitable/cost effective accommodation, to helping me rent a car
> – I was new to US and did not have a credit card – Anil Kumar took personal
> responsibility where ever 'credit card' guarantee was required. Letter of ▮▮▮▮▮▮,
> attached hereto as Exhibit MM.

> As three rather technologically inept females, something in our house is constantly falling
> apart. Every time he comes to visit, he takes it upon himself to fix at least one thing,
> whether it is the temperamental light switch or the door handle that refuses to stay
> attached to the door. First he set up our wireless, spending several hours hunched under
> our computer desk and fiddling with multicolored wires and various complicated-looking
> contraptions, then he replaced our decrepit telephones, after that he tightened all the

screws on our wobbly dining chairs and on one particularly memorable occasion, nearly fell from a stool while trying to fix our flickering light fixture. It has gotten to the point where we can count his visits by the number of things in our apartment that suddenly begin to work!  Letter of ███████████████ Letter, attached hereto as Exhibit NN.

➢ [Thank you for the] help given to daughter Jocelyn for the preparation of the review of the Sacred Heart school on Saturdays from 9am to 12 in the Cupertino Library in October 16 till today.  And also thank you for helping Jocelyn by telephone on the weekdays Anil.  My friends say that angels do not exist but my family has found an angel in our lives, that angel is you Anil. Letter of ███████████, attached hereto as Exhibit OO.

➢ I was diagnosed with End Stage Renal Disease almost 8 years ago.  I was immediately put on dialysis in the hospital.  Since then, this means 4 trips weekly to a center for 4 hours of dialysis.... When my husband has had the mental, emotional, and physical burdens accompanying many of my prolonged hospital stays, Anil has made sure my children were cared for.  Even when unforeseen circumstances arise, he changes his plans to take care of whatever is requested of him.... My husband can remain in his job (which requires him to travel) because I know Anil is there for us. ... helping to keep me alive. I will forever be grateful to him. ██████████████Letter, Ex. H.

These are but a few examples from the letters of what some would consider small ways of helping people; to the recipients they were much larger.  Considering how much Anil traveled, how much time he had to focus on ██████████████████████, and all of the larger charitable projects on which he worked, these acts are nothing short of extraordinary.

It is also noteworthy that many of these acts of kindness were done post-arrest when some would suggest Mr. Kumar's life was at its most tenuous.  Rather than going into a shell, and caring only for himself and his family, Anil redoubled his efforts to be helpful to people in need, whether he knew them as individuals or as a group of people who needed assistance.

E.  The Harm Incarceration Will Cause Anil's Good Works in India

Because of the notoriety of this case, the vast majority of work, both paying and charitable, that Mr. Kumar has been able to obtain is in India.  In the United States, Anil Kumar is regarded as so toxic that most companies and even nonprofit institutions will not associate

with him.  Should he receive an incarcerative sentence, his fledgling consulting practice in India

will vanish overnight.  Moreover, the work Mr. Kumar has begun, and which is underway at the

two universities in India, and the benefits thousands of people stand to receive from them, will

disappear if Mr. Kumar spends any time in prison.

      The culture in India is vastly different from that in the United States.  Former

Federal District Court Judge ███████████, who was raised in India, has family there, and

regularly visits India, explains "it is particularly important to consider the enormous–indeed

disproportionate–weight that is given in Indian culture to whether an individual is imprisoned for

his wrongdoing.  Imprisonment in India is almost entirely reserved for violent criminals who are

a grave threat to society, and that cultural attitude is of significance, since Anil has and will

continue to rely on his relationships in India to forward both his consulting and charitable

activities."  Letter of Judge ███████████ attached hereto as Exhibit PP.  Moreover, a

professor of law at the Government Law College in Mumbai, India, has written that a person

"incarcerated in the US for even a very short period say one day, will be precluded from any

current or future work they would be conducting specially in the education or healthcare sectors

which have most of the countries non-profit organizations and where the needs of the population

are the greatest."  Letter of ███████████, attached hereto as Exhibit QQ.

      It is not only those associated with the criminal justice system who know the

harsh consequences of an incarcerative sentence in India.  ███████████████ has grave

concerns even though he wants to keep Anil working on the projects for ████. He is unsure his

employees would accept Anil and might cause ████ to reluctantly terminate its association with

Anil were he incarcerated:

        One final thought about which the Court may not be aware; in
        India, more so than other countries, there is a societal and cultural

stigma associated with incarceration.  It is generally a punishment reserved for violent offenders.  The societal view, whether right or wrong, is akin to an incarcerated person becoming persona non grata in all aspects of life.  In this case, the stigma of incarceration, no matter for how short a period, would make it virtually impossible for Anil to get back on his feet and help others here.  I worry about the consequence of this stigma on his acceptance in this environment ███████████████████ – so deeply rooted is this cultural anomaly.  I fear an incarcerative sentence would be a death knell to Anil's attempt to remake himself and serve the greater good.  I firmly believe it would be a tragedy if Anil were further prevented from doing his life's duty.

██████████ Letter, Ex. V.  "[I]ncarceration connotes shame and disgrace and is generally a punishment reserved ... for those convicted of major criminal offences, or for extremely corrupt politicians without a conscience.  Indian society cannot, and will not, become liberal overnight.  This has been a well-publicized case in India, I know for sure that a large number of Indians who come into contact with Anil socially and professionally hereafter, may ostracize him either directly or subtly.  Incarceration will break Anil; it will destroy Anil's attempt to remake himself and serve society for greater good."  ████████████ Letter, Ex. Z.

████████, a longtime friend of Anil's and ████████████████ ███████████████, sees the same unforgiving nature.  "I am intimately familiar with local cultural norms and business culture....  I expect that incarceration will make it considerably more difficult, if not simply impossible, for Anil to continue pursuing the initiatives he is leading here, because Indian culture tends to ostracize and strip of social acceptance individuals who are sentenced to prison.  Simply put, senior leaders in business, education and other sectors with whom Anil works closely and whose support he needs for his initiatives, will not associate with an individual sentenced to time in prison."  ████████ Letter, Ex. II.

Anil has worked very hard to rehabilitate himself and start anew after the serious, and only, transgression in his life.  He has made significant strides.  Any incarceration, no matter

how short, would cost Anil the ability to earn a living and support his family and more importantly, it would end his ability to perform life-transforming charitable works for countless people in need. The only way he can continue his various charitable endeavors and commitments in India is to be able to travel there regularly and without interruption.

F.  Post Offense Rehabilitation

        Mr. Kumar should receive leniency based on his post offense rehabilitation. "[I]t is well established that a district court should consider a defendant's potential for rehabilitation in determining a sentence." United States v. Wong, 40 F.3d 1347, 1382 (2d Cir. 1994); see also United States v. Barton, 76 F.3d 499, 503 (2d Cir. 1996) ("A court may depart from the applicable guideline range in view of the defendant's efforts toward rehabilitation.").

        Indeed, the court in United States v. Blake, 89 F. Supp. 2d 328 (E.D.N.Y. 2000), departed 21 levels, at least in part, "based upon significant pre-sentence rehabilitation and the probability of continuing steps toward permanent good behavior." Id. at 339 (citing United States v. Core, 125 F.3d 74-75 (2d Cir. 1997), and United States v. Williams, 65 F.3d 301, 306 (2d Cir. 1995)). Anil Kumar is a man worthy of the same type of consideration.

        Mr. Kumar has shown commitment to rehabilitation by cooperating with the U.S. Attorney and SEC. See section IV (B) supra.

        Mr. Kumar's post-offense conduct has centered on improving lives in communities of which he is a part. His work with the Hero Group in India, (█████████ Letter, Ex. Z); as a donor and volunteer to the Foundation for Excellence (█████ Letter, Ex. W and ██████████ Letter, Ex. RR); in persuading ██████████████, to establish 50 annual scholarships to IIT for poor children (██████████████ Letter, Ex. GG), and much more, as discussed supra at II (C) and IV (D), all speak volumes about

56

Anil's commitment to his post-offense rehabilitation. Mr. Kumar has undertaken each of these projects on a *pro bono* basis. As a paid consultant he would have earned rich rewards for his efforts on commercial projects, however, his dedication to remaking himself and rehabilitating himself has led to very tangible and sustainable benefits to society.

Mr. Kumar's shame and atonement for his illegal conduct is evident in these good works. That his crimes were complete aberrations in an otherwise exemplary life is repeatedly attested to in letters to the Court:

> ➤ I would say that his recent errors were authentic anomalies: not unusual or rare, but absolutely unique. Letter of ███████, attached hereto as Exhibit SS.

> ➤ I can unequivocally state that such behavior and improper actions are clearly outside of anything I would have ever seen from him and I wholeheartedly believe this conduct is a one-time outlier rather than a trend of his general character profile. Letter of ███████ ███████Letter, attached hereto as Exhibit TT.

> ➤ This episode is at such variance to Anil's character, values, routine behaviour, life style, persona and the Anil we all know that the entire community of close friends of his in India–we simply could not reconcile him to this situation … A total departure and aberration of anything we know about Anil ! ███████Letter, Ex. V.

> ➤ His life has turned upside down but based on my knowledge of Anil's character–the acts to which he has pled guilty are completely inconsistent with his prior history and character. ███████Letter, Ex. C.

Although his wrongdoing may not qualify as aberrant behavior under the Guidelines, his misconduct was a singular event, never to be repeated.

Also, part of his post-offense rehabilitation is Anil's admission to the world of his guilt and deep remorse. Many of the letters discuss that remorse:

> ➤ Based on our discussion, it was very clear to me that AK was very remorseful about what he had done. Letter of ███████Letter, attached hereto as Exhibit UU.

> ➤ I could tell that Anil was completely shaken to his core about his conduct and he truly regretted what he had done. Letter of ███████Letter, attached hereto as Exhibit VV.

> ➤ In November 2009, after his arrest, I spoke with Anil and he expressed his regret for his

actions and deep concern for his family. Letter of ███████████, attached hereto as Exhibit WW.

➤ Anil's confession before the whole world as well as before his grown up son and wife is an act of courage born out of a deep desire to repent and rectify ... Anil has been more than candid in the confession of his actions and I can vouch without hesitation that there is genuine repentance. ████████ Letter, Ex. G.

➤ The remorse, shame and guilt for a highly sensitive and otherwise impeccable human being is always heightened and amplified. ██████████ Letter, Ex. V.

Anil Kumar has taken responsibility for his actions, has shown remorse and has taken the steps necessary to reestablish himself as a productive member of society. Starting on the day he contacted the government, Mr. Kumar has worked to change his life. Beyond his extensive and productive cooperation, Anil has demonstrated a sincere desire to rehabilitate himself, care for his family, and contribute to the less fortunate.

### G. Mr. Kumar's Extraordinary Family Circumstances Warrant a Downward Variance

It is "widely accepted" that extraordinary family circumstances are valid basis for a downward departure or variance. United States v. Johnson, 964 F.2d 124, 129 (2d Cir. 1992). More specifically, the Second Circuit has "upheld departures based on family circumstances where the family was uniquely depend[e]nt on the defendant's ability to maintain existing financial and emotional commitments." United States v. Patel, 164 F.3d 620, *3 (2d Cir. 1998) (summary order) (quoting United States v. Sprei, 145 F.3d 528, 535 (2d Cir.1998)).

Mr. Kumar's family circumstances are extraordinary and unusual. First, he is the sole source of income for his family. Moreover, Anil sends money to his close family in India to assist ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████

In addition to the support Anil provides to his family in India, ████████████████████████ ████████████████████████████████ As discussed above, Aman Kumar is a brilliant young man who will attend graduate school at Harvard in September 2012. Mr. Kumar is paying his son's tuition. Mr. Kumar's continued ability to work helps to ensure Aman's continued education.

Furthermore, █████████████████████████████████████████ █████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████ Were Mr. Kumar incarcerated for even a short period of time, Aman would, again, suffer for his father's crimes.

Since Booker rendered the Guidelines advisory, a sentencing court may consider a defendant's family circumstances to justify a non-Guidelines sentence. See U.S. v. Fearon-Hales, 224 Fed. Appx. 109, 113 (2d Cir. 2007) (summary order). Between the monetary harm the

59

family would suffer and the emotional distress incarceration would visit upon Anil's ███ son, Mr. Kumar respectfully suggests that his situation is extraordinary and therefore worthy of a variance.

Thus, the totality of circumstances demonstrate that incarceration, even for the briefest of times, would destroy Mr. Kumar's ability to earn a living, support his dependent wife, son, father and sister, as he has for so many years. ████████████████████

████████████████████

### H. Mr. Kumar's Family has Suffered in the Wake of His Arrest and Plea

Mr. Kumar's family has suffered since the day he was arrested in 2009. The media attention has been relentless and intrusive, longstanding relationships have been permanently damaged, job opportunities lost, and more. Every aspect of the Kumar's individual and collective lives has been impacted over the past 30 months of cooperation.

████████████████████████████

████████████████████████ This has caused great strain in both Anil and Malvika's life.



Aman Kumar has suffered in unexpected ways as well.

These are but a few examples of difficulties the Kumar family, individually and collectively, have suffered since Anil's arrest.  Those closest to the family seek leniency for Anil's sake, but even more for Aman's and Malvika's sake.

61

████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

As far as Malvika is concerned, there is a strong belief ████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████ Malvika and Aman have had more than their share of pain as a result of Anil's

conduct; their potential suffering is relevant to the Court's consideration.

I.    The 3553(a) Factors

   In addition to calculating a Guidelines level, the Court must consider each of the §

3553(a) factors.[17]  In doing so, the Court – taking account of all of the mitigating circumstances

in this case, including Mr. Kumar's cooperation, lack of a criminal record, history of good

works, extraordinary family circumstances,███, aberrational conduct and post-offense

rehabilitation – must arrive at a sentence that is "sufficient, but not greater than necessary, to

comply with the purposes" of sentencing. 18 U.S.C. § 3553(a); see also Gall v. United States,

128 S.Ct. 586, 596-97 (2007).  Neither the nature nor circumstances of the offense nor the

history and characteristics of the defendant need be extraordinary to justify a deviation from the

advisory Guidelines range. See id. at 594-95 ("We reject . . . an appellate rule that requires

'extraordinary' circumstances to justify a sentence outside the Guidelines range."); see also

United States v. Jones, 531 F.3d 163, 171 (2d Cir. 2008) ("In reviewing a district court's

explanation of a sentence for reasonableness at either the procedural or substantive step of

analysis, Gall holds that an appellate court may not demand 'extraordinary' circumstances to

justify non-Guidelines sentences.").  In fact, downward variances may be based on factors that

are "disfavored" under the Guidelines, even in the absence of extraordinary circumstances. See

United States v. Munoz-Nava, 524 F.3d 1137, 1148 (10th Cir. 2008).

   i.    Anil Kumar's History and Circumstances of Offense

   Without minimizing the significance of the offenses to which Anil Kumar pleaded

guilty, through his active cooperation and his post-offense rehabilitation, Mr. Kumar has

---

[17]  Mr. Kumar submits that under 3553 "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner" militates strongly in favor of a sentence of probation because there is likely no knowledge of or ability to treat SCA 12 in the U.S. Prison System.  Should the Court wish more information relating to the need for further education, Mr. Kumar would be happy to supplement this memorandum.

demonstrated the conduct and attributes that warrant leniency. As discussed in great detail above, Mr. Kumar is a person who immediately acknowledged his mistake, took steps to understand how he could have done what he did, has learned from his wrongdoing, and has strived to continue to make positive contributions to society. Not only did he testify against Mr. Rajaratnam and help the government secure a conviction in that landmark case, he testified against his former mentor and long time family friend, Rajat Gupta. Moreover, he cooperated with the SEC in both the Rajaratnam and Gupta cases. Beyond the obvious benefit that the defendant provides to society through his cooperation, a defendant's cooperation also reveals much about his character. For example, in United States v. Stewart, the Second Circuit affirmed the district court's conclusion that the defendant's cooperation "demonstrates a willingness to help law enforcement and reduces the need for rehabilitation and deterrence." Id. at 141. Similarly, in United States v. Fernandez, 443 F.3d 19 (2d Cir. 2006), the Second Circuit held that consideration of the factors set forth in 18 U.S.C. § 3553(a) "includes the history of the defendant's cooperation and characteristics evidenced by cooperation, such as remorse or rehabilitation." Id. at 33. If cooperation is truly a comment on one's character, Mr. Kumar's significant, early, and extensive cooperation should speak loudly of his character.

Finally, through his post-offense actions he has demonstrated his commitment to continuing to be a productive member of society; his dedication to his family is beyond question and his post-offense charitable and consulting works are all directed at making the world better for the least fortunate and most in need amongst us, through education and gainful employment. Mr. Kumar's conduct over the past two years should factor heavily in favor of leniency.

ii.    Specific Deterrence and Need to Protect the Community[18]

Section 3553(a)(2) contemplates the need for the sentence imposed to reflect the seriousness of the offense and to protect the public from further crimes by the defendant. In United States v. Gaind, 829 F. Supp. 669 (S.D.N.Y. 1993), the defendant was convicted of making false statements in connection with performing government contracts. The Court held that a downward departure was warranted where certain purposes of sentencing, namely protecting the public from any future crimes from the defendant and serving as a deterrent, already had been satisfied by the destruction of the defendant's business after his crimes were exposed to the public. The Court reasoned that,

> [e]limination of the defendant's ability to engage in similar or related activities or indeed any major business activity for some time, and the substantial loss of assets and income resulting from [his crime] have decreased for the foreseeable future his ability to commit further crimes of the type he was tempted to undertake, and constitutes a source of both individual and general deterrence.

Gaind, 829 F. Supp. at 671.

Through his cooperation, his new professional life, and the letters from those businesses and community programs dependant on him, Anil Kumar has proven that he is not a threat to repeat his previous conduct. Rather than protecting the community, incarcerating Mr. Kumar would injure the community and adversely affect thousands of students by depriving them of his special skills and ability to finish the projects he has started.

---

[18]    Incarceration in this case to achieve general deterrence, is unnecessary. See United States v. Stewart, (noting that cooperation "reduces the need for rehabilitation and *deterrence*." 590 F.3d. at 141 (emphasis added); see also United States v. Fernandez, 443 F.3d 19 (2d Cir. 2006). In short, Mr. Kumar is doing the most that society desires of anyone who has committed a crime: he has renounced his previous conduct, provided substantial assistance to the government, and is making positive and substantial contributions to society.

## V.   CONCLUSION

This sentencing memorandum has included quotations from many letters that can assist the Court in fashioning the appropriate sentence in this case. The following quotation demonstrates the reality and collateral consequences to innocent third parties should Mr. Kumar receive an incarcerative sentence. ███████████ wrote:



███████ Letter, Ex. A.

Anil Kumar has done all a person can do to make amends for wrongdoing and done so with extraordinary effectiveness. His cooperation has been singular. He has rededicated his life to the goals it previously served and he has sought and gained understanding of his own limitations so there is no risk of future wrongdoing. We respectfully suggest that Anil Kumar has earned a sentence of probation.

Dated: New York, New York
      July 13, 2012

MORVILLO LLP

By: _____
      Gregory R. Morvillo (GM-1234)
*Attorneys for Defendant Anil Kumar*
One World Financial Center, 27th Floor
New York, New York 10281
(212) 796-6330

MORVILLO, ABRAMOWITZ, GRAND,
IASON, ANELLO & BOHRER, P.C.

Paul R. Grand
*Attorneys for Defendant Anil Kumar*
565 Fifth Avenue
New York, New York 10017
(212) 856-9600